UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

Sheila E. Vanbuskirk,

                    Plaintiff,                    07-CV-0525

          v.                                      **DECISION
                                                  and ORDER**

MICHAEL J. ASTRUE, Commissioner
of Social Security

                    Defendant.

_____


## <u>Introduction</u>

     Plaintiff  Sheila  E.  Vanbuskirk  ("Plaintiff")  brings  this
action pursuant to the Social Security Act, 42 U.S.C. §§ 405(g) and
1383(c)(3),  seeking  review  of  the  final  decision  of  the
Commissioner  of  Social  Security  ("Commissioner"),  denying  her
application  for  Disability  Insurance  Benefits.[1]  Specifically,
Plaintiff  alleges  that  the  decision  of  Administrative  Law  Judge
("ALJ")  Robert  T.  Harvey,  as  affirmed  by  the  Social  Security
Appeals  Council  ("Council"),  denying  her  application  for  benefits
was  against  the  weight  of  substantial  evidence  contained  in  the
record  and  was  contrary  to  applicable  legal  standards.

     Plaintiff  moves  for  judgment  on  the  pleadings  pursuant  to
Fed.  R.  Civ.  P.  12(c)  ("Rule  12(c)"),  seeking  reversal  of  the
Commissioner's  ruling  or,  in  the  alternative,  remand  of  the  matter

_____

     [1]This case was transferred to the undersigned by the Honorable John T. Curtin, Judge, United States District
Court for the Western District of New York by Order dated October 29, 2009.

for a new hearing. The Commissioner cross-moves for judgment on the pleadings pursuant to Rule 12(c), on grounds that the ALJ's decision was supported by substantial evidence contained in the record and was based on the correct application of appropriate legal standards. For the reasons set forth below, I find that the decision of the Commissioner is supported by substantial evidence, and is in accordance with applicable law. I therefore grant the Commissioner's cross-motion for judgment on the pleadings, and deny Plaintiff's motion for judgment on the pleadings.

## Background

### I. Procedural History

On August 29, 2003, Plaintiff, who was then 38 years old, filed an application for Disability Insurance Benefits under Title II, §§ 216(i) and 223 of the Social Security Act ("the Act"). Plaintiff claimed to be disabled since January 13, 2001, due to a neck injury. (Transcript of the Administrative Proceedings at pages 48, 68) (hereinafter "Tr."). Plaintiff's onset of disability date was subsequently amended to May 1, 2002. (Tr. at 724). Plaintiff's application was denied by the Social Security Administration ("the Administration") initially on November 5, 2003. (Tr. at 25). Plaintiff filed a timely request for hearing on January 9, 2004. (Tr. at 29).

Thereafter, Plaintiff appeared with counsel at an administrative hearing before ALJ Robert T. Harvey, on August 17, 2005. (Tr. at 722). In a decision dated October 25, 2005, the ALJ

determined that Plaintiff was not entitled to disability benefits. (Tr. at 17). Plaintiff filed a timely request for a review of the hearing decision on December 22, 2005. (Tr. at 8). The ALJ's decision became the final decision of the Commissioner when the Social Security Appeals Council denied Plaintiff's request for review on June 8, 2007. (Tr. at 5). On August 10, 2007, Plaintiff filed this action.

II.  **Medical History**

A.  **Plaintiff's injury, MRI and CT scan.**

On January 13, 2001, while at work, Plaintiff bent over a bench and felt a sharp pull in her neck and back. (Tr. at 705). Dr. Norsky initially examined Plaintiff on January 16, placed her on total disability from work, and ordered an MRI. Id. The MRI revealed mild bulging at the C5-6 and C6-7 disc spaces, straightening of the upper cervical spine, mild degenerative changes and possible muscle spasm, but no spinal cord compression, nerve root compression or disc herniation. (Tr. at 241). On January 31, 2001, a CT scan of Plaintiff's brain was negative for hemorraging and lesions. (Tr. at 123, 240). Plaintiff briefly returned to work for about one week in February 2001. (Tr. at 127).

B.  **Chiropractor Dr. Nicastro's reports.**

On February 13, 2001, chiropractor Dr. Nicastro began treating Plaintiff due to head and neck pain, and diagnosed cervical and thoracic subluxations (dislocations), and cervical and thoracic sprain/strain. (Tr. at 696). Chiropractor Nicastro stated Plaintiff

was "totally disabled" on April 29, June 26, August 23, and October 2, 2003. (Tr. at 308-310, 341). On October 2, 2003, she diagnosed chronic cervical sprain strain, narrow disc space at C4-5, degenerative disc disease, degenerative joint disease, C5-6 for chronic occipital neuralgia. (Tr. at 341).

    C.    **Evaluation for Worker's Compensation Board by Dr. Reina.**

Dr. Reina examined Plaintiff on April 6, 2001 and reported that Plaintiff suffered from "postural, chronic cervical neuritis and shoulder girdle/paraspinal cervical muscle strain" related to the on-the-job neck injury suffered by Plaintiff on January 13, 2001. (Tr. at 126). Dr. Reina also stated Plaintiff suffered from mild C5-C6 disc bulging, unrelated to the neck injury. Id. Dr. Reina found Plaintiff in no acute distress, walked with a normal gait, and suffered neck pain and burning during the range of motion testing. (Tr. at 126, 128). Dr. Reina opined that Plaintiff's disability was temporary, moderate, and partial with a good prognosis. Id. Dr. Reina reported that Plaintiff stated her pain was at 8 ½ to 9 out of 10 and that doing light housework or prolonged sitting increased her pain. (Tr. at 127).

    C.    **Consultative neurological examinations by Dr. Bhat.**

Dr. Bhat examined Plaintiff on April 18, 2001, and stated that Plaintiff suffered from a constant headache at a pain level of 6 out of 10, and light headedness. (Tr. at 131). He reported that Plaintiff was in moderate distress, appeared to be in pain, with minimally restricted neck motion and tenderness over the left

greater occipital nerve. (Tr. at 132). Dr. Bhat reported Plaintiff suffered from left greater occipital neuralgia triggering mild migraines, recommended a change in pain medication, referred Plaintiff to a pain management clinic, and expected Plaintiff to make a good recovery. (Tr. at 133).

Dr. Bhat re-evaluated Plaintiff on May 7, 2002 and stated that Plaintiff had been doing "very well without any discomfort and pain until a month ago when the symptoms recurred." (Tr. at 130). Plaintiff again suffered from neck pain radiating to the left side of the head, left side of the parietal area, left shoulder, and left eye. Id. Plaintiff's pain was at a 4 out of 10 and she was in no distress. Id. Plaintiff had tenderness over the left greater occipital nerve and slightly restricted neck movements and recommended Plaintiff seek help from Dr. Mevorach, a pain management specialist. Id.

**D.**   **Accupuncture and left occipital nerve block reports by Dr. Hong.**

On June 8, 2001, treating pain management specialist Dr. Hong reported that Plaintiff suffered from a burning, sharp, shooting chronic headache pain along the left side of her neck and head radiating down into her trapezius and numbness in the extremities. (Tr. at 194). Plaintiff reported some relief from laying down and medications but no relief from chiropractic treatment. Id. Plaintiff reported her pain ranged from 5 to 10 throughout the course of a day. Dr. Hong found moderate to severe left occipital

tenderness and bilateral trigger point tenderness with mild spasm in the trapezius muscle. (Tr. at 196). Dr. Hong recommended Plaintiff receive a nerve block and begin taking Neurontin. Id.

On June 15, 2001, Dr. Hong reported the nerve block did not decrease Plaintiff's pain and Plaintiff suffered "significant tenderness in the left occipital area with pain shooting down to the vertex." (Tr. at 177). Dr. Hong found Plaintiff had normal neck range of motion, mild trapezius tenderness, normal reflexes, and normal sensory and motor function of the extremities. (Tr. at 177).

On Oct. 31, 2001, Dr. Hong performed a radio frequency ablation of the left occipital nerve on Plaintiff due to chronic left-sided occipital headache. (Tr. at 140). Plaintiff reported complete pain relief in the left occipital area and mild tenderness in the left lower trapezius area to Dr. Hong on Nov. 8, 2001. (Tr. at 155). Dr. Hong released Plaintiff back for a work trial due to her good response to the treatment. (Tr. at 155).

E.    **Evaluation for Worker's Compensation Board by Dr. Graham.**

On June 4, 2002, Plaintiff reported to consultative physician Dr. Graham that following gastric surgery, she returned to work on Jan. 2, 2002 at Corning without restrictions, full duty, until March 2002 when her headaches, neck pain and stiffness returned. (Tr. at 182). Plaintiff reported her headaches had stopped but she had experienced numbness and tingling in the left arm. (Tr. at

182). Chiropractic massage and manipulation relieved her symptoms to some degree. (Tr. at 182). Dr. Graham reported that Plaintiff appeared to be in no great distress, suffered tenderness in the left occipital area, had good range of motion of the cervical spine, and normal findings upon neurological examination of the upper extremities. (Tr. at 182). Dr. Graham recommended another radio frequency ablation of the left greater occipital nerve based on the Plaintiff's excellent response to the previous treatment. (Tr. at 183). Dr. Graham opined that Plaintiff suffered a "moderate degree of disability" and that a light duty job would be appropriate once she was treated by a pain management specialist. Id.

**F.    Pain Management Specialist Dr. Mevorach's Reports.**

On June 25, 2002, Plaintiff saw pain management specialist Dr. Mevorach and complained of her constant pain in the left side of her neck which radiated through her head to above her left eye, intermittent numbness in her left arm and increased pain throughout the day. (Tr. at 185). Dr. Mevorach reported that Plaintiff was in no acute distress, suffered sensory deficits to pinprick in the upper extremities, had normal range of motion, no muscle spasm, mild tenderness at midline and moderate tenderness at the left paramedian area, mild tenderness at the right paramedian area, and left occipital nerve tenderness. (Tr. at 187). Dr. Mevorach stated that Plaintiff suffered from left occipital neuralgia with

cervicogenic headaches and recommended a pulse radiofrequency procedure. (Tr. at 187). On July 1, 2002, Dr. Mevorach performed the pulse radiofrequency procedure which he reported stopped the headache pain. (Tr. at 207). However, on September 6, 2002, Plaintiff reported "not much relief" from this procedure when consulting Dr. Lockard. (Tr. at 572).

G. **Examining Chiropractor Dr. Kuhn's report**.

Dr. Kuhn examined Plaintiff on Nov. 14, 2002 and reported that Plaintiff complained of cervical pain, arm pain, left leg numbness, left hip pain, and occipital headaches. (Tr. at 258, 260). Dr. Kuhn diagnosed cervical sprain/strain associated with occipital neuralgia triggering headaches. (Tr. at 260). Dr. Kuhn concluded Plaintiff suffered a moderate partial disability caused by her injury of Jan. 13, 2001. Dr. Kuhn stated that Plaintiff would be seeking a job in the next month or two and could return to normal work activities by Jan. 2003, including her past work at Corning. (Tr. at 261).

H. **Dr. Lockard's and Dr. Rosenberg's reports**.

On Feb. 28, 2003, pain management anesthesiologist Dr. Lockard performed a left greater occipital nerve block on Plaintiff. (Tr. at 266). Dr. Rosenberg examined Plaintiff on May 19, 2003, and reported to the NYS Worker's Compensation Board that Plaintiff had no improvement after two years of chiropractic treatment, and found that Plaintiff had a slight limitation of cervical spine motion and

slightly limited shoulder range of motion. (Tr. at 267).
Dr. Rosenberg deferred any disability assessment to a neurologist
and stated that chiropractic treatment did not improve Plaintiff's
symptoms. (Tr. at 268).

I.    **DDS medical consultant's RFC assessment.**

On June 29, 2003, NYS Office of Temporary and Disability
Assistance medical consultant H. Janneh limited Plaintiff to
occasionally lift/carry 20 lbs., frequently lift/carry 10 lbs.,
stand/walk 6 hours in an 8 hour workday, sit 6 hours in an 8 hour
workday, and limited push/pull. (Tr. at 270). The consultant found
no postural, manipulative, visual, communicative or environmental
limitations. (Tr. at 272). The consultant went on to find
partially credible Plaintiff's allegations of "headaches, neck and
shoulder pain, dizziness, numbness of arms and legs." (Tr. at 273).


J.    **Examining physician Dr. Levy's report.**

On July 17, 2003, Dr. Levy reported to the NYS Worker's
Compensation Board that Plaintiff continued to suffer from
occipital neuralgia and cervical strain, both related to her on-
the-job injury. (Tr. at 281). Dr. Levy stated Plaintiff suffered
from persistent neck stiffness and pain, headaches, left lateral
lower cervical tenderness, mild muscle spasm, left-sided sensory
arm and leg decrease. Id. Dr. Levy concluded Plaintiff had a
moderate, partial, temporary disability which could be temporarily

improved by the radiofrequency procedure. (Tr. at 281). Dr. Levy stated Plaintiff could return to light duty work with a 10 lb. lifting limitation and needed to avoid frequent bending, lifting, and turning. (Tr. at 281).

**K.** **Pain management specialist Dr. Carsten's reports.**

Dr. Carstens noted on Sept. 18, 2003, that Plaintiff suffered from cervical pain radiating to her head, shoulders, back, hips and feet in a range of 2-10 out of 10. (Tr. at 335). He also noted Plaintiff's reports of weakness in her upper extremities, numbness with tingling in her upper and lower extremities, being awakened by pain during the night, and the pain's aggravation by increased activity of the upper extremities. (Tr. at 335-36). Rest and medication relieved Plaintiff's pain. Id.

Dr. Carstens found Plaintiff suffered from mechanical and myofasical pain disorder of the cervical, thoracic and lumbar regions, S1 joint region pain and dysfunction, muscle spasms of the cervical, thoracic and lumbar regions, cervical radiculopathy with disk bulges and degenerative changes, sleep dysfunction due to cervical pain, minimal situational depression, and history of headaches. (Tr. at 338). Dr. Carstens recommended Plaintiff continue her medications, begin myotherapy, begin acupuncture, and receive trigger point injections and physical therapy. (Tr. at 338).

On Oct. 29, 2003, Dr. Carstens reported to NYS Office of Temporary and Disability Assistance ("NYS OTADA") his diagnoses of cervical radiculopathy with disc bulges and myofascial pain disorder of the cervical region, and Plaintiff's symptoms of severe pain of the cervical region, back and shoulders with muscle spasms. (Tr. at 350). Dr. Carstens noted Plaintiff suffered mild depression and decreased endurance due to pain, detailed her range of motion limitations, and gave no opinion regarding Plaintiff's work related limitations. (Tr. at 350-52).

**L.    Treating physician Dr. Agrawal's report.**

On September 5, 2003, internal medicine specialist Dr. Agrawal found Plaintiff had spasms at the left side of her neck and left shoulder blade area, painful shoulders, and mild narrowing of the disc space at C4-5. (Tr. at 329-30). He diagnosed Plaintiff as suffering from cervical injury, cervical muscle spasm and moderate severity range of motion pain. (Tr. at 330).

On September 15, 2003, Dr. Agrawal observed neck tenderness and diagnosed Plaintiff as suffering from recurrent renal stone on the left side, obesity, anemia, status post cholecystectomy (gall bladder removal surgery), and bruised easily with no bleeding on skin. (Tr. at 332, 33). Dr. Agrawal recommended trigger point injections. (Tr. at 333).

**M.  Examining physician Dr. Norsky's report.**

On Oct. 24, 2003, Dr. Norsky examined Plaintiff due to her neck pain and stiffness. (Tr. at 343). Plaintiff complained of constant pain radiating from her neck to her shoulders and left hand, difficulty driving a car and performing housework. <u>Id</u>. Dr. Norsky found that Plaintiff had tenderness in her neck and muscle spasm in her left shoulder. <u>Id</u>.  Dr. Norsky also found Plaintiff's range of motion of the cervical spine somewhat decreased and no muscle atrophy or limitation of range of motion of the shoulders, lumbar spine, and lower extremities. (Tr. at 343-44). Dr. Norsky diagnosed chronic upper back pain. (Tr. at 344).

**N.  Physician's assistant Scott Piatt's report.**

On Sept. 2, 2003, treating physician's assistant Scott Piatt noted Plaintiff's complaint of right arm radicular pain. (Tr. at 715). He observed no acute distress, a supple neck, and good range of motion in Plaintiff's cervical spine. (Tr. at 715). He observed tenderness of the neck and back. (Tr. at 715). Physician's assistant Piatt diagnosed chronic cervical arthralgias, degenerative disc disorder, cervical myofascial syndrome, and chronic back pain. <u>Id</u>. He prescribed medication, warm compresses and follow up with specialists. <u>Id</u>.

**Discussion**

**I.    Jurisdiction and Scope of Review**

42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. Additionally, the section directs that when considering such a claim, the Court must accept the Commissioner's findings of fact if those findings are supported by substantial evidence in the record. Substantial evidence is defined as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 217 (1938). Section 405(g) thus limits the Court's scope of review to determining whether or not the Commissioner's findings were supported by substantial evidence. See Monqeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (finding that a reviewing Court does not try a benefits case de novo). The Court is also authorized to review the legal standards employed by the Commissioner in evaluating Plaintiff's claim.

The Court must "scrutinize the record in its entirety to determine the reasonableness of the decision reached." Lynn v. Schweiker, 565 F. Supp. 265, 267 (S.D. Tex. 1983) (citation omitted). The Commissioner asserts that his decision was reasonable and is supported by the evidence in the record, and cross-moves for judgment on the pleadings pursuant to Rule 12(c). Judgment on the pleadings may be granted under Rule 12(c) where the material facts

are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. <u>Sellers v. M.C. Floor Crafters, Inc.</u>, 842 F.2d 639 (2d Cir. 1988). If, after a review of the pleadings, the Court is convinced that Plaintiff can prove no set of facts in support of his claim which would entitle him to relief, judgment on the pleadings may be appropriate. <u>See</u> <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).

## II. <u>The Commissioner's decision to deny Plaintiff benefits was supported by substantial evidence in the record</u>

### A. <u>The ALJ properly applied the five-step analysis to conclude that Plaintiff was not disabled under the Act.</u>

The Act defines disability as "physical or mental impairment or impairments [. . .] of such severity that [claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 223(d)(2) and 1614(a)(3). In this case, the ALJ found Plaintiff was not under a disability within the meaning of the Act during the period of May 1, 2002 through Oct. 25, 2005. (Tr. at 17-18).

In reaching his conclusion, the ALJ adhered to the Administration's five-step sequential analysis for evaluating applications for disability benefits. <u>See</u> 20 C.F.R. § 404.1520.[2]

---

[2]Pursuant to the five-step analysis set forth in the regulations, the ALJ, when necessary will: (1) consider whether the claimant is currently engaged in substantial gainful activity; (2) consider whether the claimant has any severe impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities; (3) determine, based solely on medical evidence, whether the claimant has any impairment or impairments listed in Appendix 1 of the Social Security Regulations; (4) determine whether or not the claimant

Under Step 1 of the process, the ALJ found that Plaintiff had an unsuccessful work attempt in 2003 but had otherwise not engaged in substantial gainful activity since her alleged onset of disability. (Tr. at page 18).

At Step 2, the ALJ found that Plaintiff suffered from the severe impairments of left occipital neuralgia, headaches, and myofascial pain syndrome and made no finding of non-severe impairments. (Tr. at 20).

At Step 3 of the 5-step analysis, the ALJ concluded that Plaintiff's severe impairments did not meet or medically equal in severity the criteria for any impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. (Hereinafter "the Listings"). (Tr. at 20). In reaching this conclusion, the ALJ found evidence of "mild C5-C6 and C6-C7 disc bulging, but no evidence of spinal stenosis, nerve compression or herniation." (Tr. at 18). The ALJ went on to state that evidence existed of Plaintiff's occipital neuralgia triggering mild migraine headaches but no evidence of cervical radiculopathy, intracranial pressure, no compression etiology and no acute distress. (Tr. at 19).

In addition, the ALJ found evidence that in June 2002, Plaintiff had normal function of her upper extremities but a slight cervical spine range of motion deficit in May 2003. (Tr. at 20). Plaintiff received treatment for chronic cervical arthralgias,

---

maintains the residual functional capacity to perform his past work; and (5) determine whether the claimant can perform other work. See id.

degenerative disc disease, cervical myofascial syndrome, chronic back pain, headaches, cervical radiculopathy and myofascial pain disorder. (Tr. at 19). Plaintiff received chiropractic treatment for neck and right arm pain. (Tr. at 19). Finally, the ALJ found that Plaintiff was diagnosed with chronic cervical sprain/strain, degenerative disc disease and degenerative joint disease with evidence of upper back pain. (Tr. at 19).

Further, at Step 4, the ALJ found Plaintiff unable to perform her past relevant work as an operations associate. (Tr. at 21). The ALJ also found Plaintiff able to lift and carry ten lbs., sit for six hours and stand/walk for two hours in an eight hour workday. (Tr. at 21). The ALJ found Plaintiff could occasionally bend and reach and could not work on unprotected heights, or around heavy, moving or dangerous machinery. (Tr. at 21). In reaching this finding, the ALJ found Plaintiff's statements about her symptoms and pain to be not generally credible and gave them little weight. (Tr. at 20). The ALJ also gave little weight to the opinion of Plaintiff's chiropractors and physician's assistant. Id.

Finally, at Step 5, the ALJ found that considering Plaintiff's age, education, work experience and RFC, jobs exist in the local and national economy which Plaintiff could perform. (Tr. at 22, 23). In reaching this finding, the ALJ used the Medical-Vocational Guidelines in 20 C.F.R. § 404, Subpart P, Appendix 1 to determine that jobs exist in the national economy which Plaintiff can perform and therefore she is not disabled. (Tr. at 22).

The ALJ properly applied the five-step analysis. Therefore, I find that the ALJ properly concluded that Plaintiff was not disabled within the meaning of the Act.

**B.    The ALJ properly evaluated Plaintiff's subjective complaints.**

Plaintiff contends the ALJ improperly disregarded the medical evidence and other evidence in the record which substantiated Plaintiff's statements about her pain and symptoms. (Plaintiff's Memorandum at 7-10).

In making his findings, the ALJ must consider Plaintiff's statements about the effects of her symptoms, such as pain, on her activities of daily living and ability to work. 20 C.F.R. Section 404.1529(a). However, the ALJ must also consider whether the medical evidence shows that Plaintiff's medical impairments could reasonably be expected to produce Plaintiff's stated symptoms. Id. The ALJ must then determine the intensity and persistence of Plaintiff's symptoms and its effect on her capacity for work activities in light of all the available evidence, including objective medical evidence, opinion evidence, and other evidence. 20 C.F.R. § 404.1529(c). The ALJ may not reject Plaintiff's statements about the intensity of her symptoms based on his consideration of the objective medical evidence alone. Id.   The ALJ should consider other evidence including prior work record, claimant's statements about her symptoms, symptoms reported by treating physicians and others, and personal observations. Id. Relevant factors to consider include

daily activities, duration, frequency and intensity of symptoms, aggravating factors, side effects from medication, and treatments used. Id. The ALJ must give specific reasons for a credibility finding. SSR 96-7p.

Here, after reviewing the objective medical evidence, opinion evidence and other evidence, the ALJ found "not generally credible" and gave "little weight" to Plaintiff's statements about her pain and symptoms. (Tr. at 20). Specifically, the ALJ properly based the credibility finding on Plaintiff's statements about her symptoms, the objective medical evidence in the record, the opinion medical evidence, Plaintiff's activities of daily living, and the ALJ's personal observation. (Tr. at 20).

The ALJ properly considered Plaintiff's statements about her symptoms in determining her credibility. Plaintiff testified that she experienced constant headaches, constant neck and shoulder pain, daily neck spasms, daily lower back pain after sitting, hand and arm numbness after doing housework, occasional leg numbness, hip pain, foot cramps, and blurred vision after bending over. (Tr. at 728, 731-735). The ALJ found nothing in the record to support Plaintiff's statements about the severity of her symptoms. (Tr. at 20). The ALJ noted that Plaintiff contradicted herself by stating early in her testimony that she did not suffer from muscle spasms and later stating that she suffered from daily neck spasms. (Tr. at 20, 732, 734-35).

The ALJ properly considered the objective medical evidence in the record including an MRI, a CT scan, and treating source notes in making the credibility determination. These objective findings showed mild disc bulging, mild changes in the spine, possible muscle spasm, mild spondylosis but no evidence of compression or herniation. Treating source notes reported neck and shoulder spasms, tenderness and minimally restricted or good range of motion in Plaintiff's cervical spine and tenderness in her left occipital area. Therefore, the ALJ properly concluded that the objective medical findings did not support the severity of Plaintiff's alleged complaints.

The ALJ properly considered the medical opinion evidence concerning the nature and severity of Plaintiff's impairment in making his credibility determination. The opinion evidence of examining physician Dr. Graham concluded that Plaintiff had a "moderate degree of disability" and could return to "light duty work" once she had been treated by a pain management specialist. (Tr. at 183). Examining physician Dr. Levy opined that Plaintiff had a "moderate, partial, temporary disability" and could return to light duty work. (Tr. at 281). Therefore, the ALJ properly concluded that the medical opinion evidence did not support the alleged severity of Plaintiff's impairments.

The ALJ noted but gave little weight to other evidence in making his credibility determination. Chiropractor Dr. Kuhn opined that Plaintiff had a "moderate partial disability" and could return

to her previous work at Corning Glass by January 2003. (Tr. at 20, 261). Chiropractor Nicastro opined that Plaintiff was totally disabled. (Tr. at 20, 308-310, 341). The ALJ properly gave little weight to the opinions of these medical source, as explained below.

The ALJ properly considered Plaintiff's activities of daily living in making the credibility determination. Plaintiff testified that she cooked and cleaned "very minimally," did not make beds, vacuum, sweep, mop, take out the trash, do yard work, shop, visit friends, or go to church. (Tr. at 738-41). Plaintiff also stated that she used a dishwasher, needed assistance in doing laundry, drove only 14 to 28 miles in a week, bathed and dressed herself, was able to lift a gallon of milk for a brief time, walked to the corner, picked up small items, and used a computer for about ten minutes at a time. Id. The ALJ however found that Plaintiff's activities of daily living consisted of "cleaning, cooking, loading the dishwasher, doing laundry, using a computer, and driving. She is able to bathe and dress herself." (Tr. at 20). The ALJ concluded that Plaintiff's activities of daily living were inconsistent with the alleged severity of Plaintiff's impairments.

The ALJ also considered his personal observation of Plaintiff in determining her credibility. The ALJ stated that he observed Plaintiff carrying a shopping bag containing a loose leaf notebook although she testified to being unable to carry her purse. (Tr. at 20, 739).

I find that substantial objective and opinion medical evidence and other evidence exists in the record to support the ALJ's finding that Plaintiff's statements about her symptoms and physical limitations were not entirely credible. Therefore, I find the ALJ properly determined that the evidence in the record does not support the degree of limitation alleged by Plaintiff.

### C. **The ALJ properly determined Plaintiff's RFC.**

Plaintiff contends that in determining Plaintiff's RFC, the ALJ failed to properly consider the opinion of chiropractor Dr. Kuhn and failed to note and evaluate all of the findings of Workers' Compensation consultant Dr. Levy. (Plaintiff's Memorandum at 12). In addition, Plaintiff argues that the ALJ improperly concluded that Plaintiff retained the RFC to perform sedentary work. Id.

The Commissioner has the authority to regulate the nature, extent and manner of taking and furnishing evidence in order to establish the right to Social Security disability benefits. 42 U.S.C. § 405(a). The ALJ must consider all of the evidence available in the record. SSR 06-03p. However, only evidence from "acceptable medical sources" may be used to establish an impairment, as a medical opinion, or given controlling weight. Id. However, evidence from sources not considered "acceptable" medical sources can be used to show the severity of an impairment and its effect on the claimant's functioning. Id. Health care providers who are not acceptable medical sources include chiropractors and

physician's assistants. Id. However, the Second Circuit does not require the ALJ to "mention every item of testimony" in his decision or explain his consideration of particular evidence. Monguer v. Heckler, 722 F.2d 1033, 1040 (2d. Cir. 1983).

Here, the ALJ properly gave little weight to the opinion of chiropractor Dr. Kuhn because Dr. Kuhn is a chiropractor. (Tr. at 20). In considering the report of examining physician Dr. Levy, the ALJ properly did not give his opinion controlling weight. (Tr. at 19). The ALJ is not required to explain his consideration of particular evidence from an examining physician which is not given controlling weight.

D. **The ALJ properly relied on the Grids at Step Five of the sequential analysis.**

Plaintiff argues the ALJ improperly relied on the Medical - Vocational Guidelines, 20 C.F.R § 404, Subpart P, Appendix 2 ("the Grids") in finding Plaintiff was not disabled. (Plaintiff's Memorandum at 13-14).

At Step 5 of the sequential analysis, the Commissioner must show that Plaintiff retains the residual functional capacity to perform other substantial gainful activity in the national economy. 20 C.F.R. § 404.1560 (c). At this step, the Commissioner may rely on the Grids unless the claimant suffers from significant nonexertional impairments. Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004). If claimant suffers significant nonexertional impairments, the Commissioner must provide the testimony of a

vocational expert as evidence that jobs exist in the national economy which the claimant can perform. Id.

Exertional limitations "affect only your ability to meet the strength demands of jobs" and include limitations in sitting, standing, walking, lifting, carrying, pushing, and pulling. 20 C.F.R. § 404.1569a(b). Nonexertional limitations "affect only your ability to meet the demands of jobs other than strength demands" and include limitations on the workplace environment and on the performance of postural and manipulative functions. 20 C.F.R. § 404.1569a(c).

If a claimant's RFC consists of only exertional limitations, the Grids may be used to determine disability. 20 C.F.R. § 404.1569a(b). If a claimant's RFC consists of only nonexertional limitations, the Grids may not be used to determine disability. 20 C.F.R. § 404.1569a(c). If, as in this case, a claimant's RFC consists of both exertional and nonexertional limitations, the Grids may not be used to determine disability unless disability may be found based on the exertional limitations alone. However, if disability is not determined based on the exertional limitations alone, the Grids may be used as a "framework to guide our decision." 20 C.F.R. § 404.1569a(d). The Second Circuit has held:

> [T]he necessity for expert testimony must be determined on a case-by-case basis. If the [Grids] adequately reflect a claimant's condition, then their use to determine disability status is appropriate. But if a claimant's nonexertional impairments "significantly limit the range of work permitted by his exertional limitations" then the grids obviously will not accurately determine disability status because they fail to take into account claimant's nonexertional impairments.

> *Blacknall*, 721 F.2d at 1181. Accordingly, where the claimant's work capacity is significantly diminished beyond that caused by his exertional impairment the application of the grids is inappropriate.

*Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986).

Here, the ALJ did not find that Plaintiff's nonexertional limitations significantly limited the range of sedentary work available to her in the national economy. (Tr. at 22). The ALJ found Plaintiff's RFC to include nonexertional workplace limitations and postural limitations which have a minimal impact on sedentary work.

Therefore, I find that Plaintiff's nonexertional impairment did not significantly limit the range of work available to her and the ALJ properly used the Grids as a framework at Step 5 in the sequential analysis.

## **Conclusion**

For the reasons set forth above, I conclude that the ALJ's decision is supported by substantial evidence in the record and, therefore, the Commissioner's cross-motion for judgment on the pleadings is granted. Plaintiff's motion for judgment on the pleadings is denied, and Plaintiff's complaint is dismissed with prejudice.

ALL OF THE ABOVE IS SO ORDERED.

                               s/Michael A. Telesca
                            MICHAEL A. TELESCA
                         United States District Judge

Dated: Rochester, New York
       November 20, 2009